## Case No. 839.

### BANGS v. LITTLE.

[1 Ware, (506,) 520.] [1]

District Court, D. Maine.　Aug. 12, 1839.

SEAMEN—POWER OF MASTER—CORPORAL PUNISHMENT.

1. The master of a vessel has the authority to correct by corporal punishments the negligence or misconduct of any of his crew. But his authority in this respect is not coextensive with that of a parent over his children, or a schoolmaster over his scholars. It extends only to the correction of such negligence or misconduct as relates to their duties as members of the ship's crew, or tends directly to the subversion of the discipline and police of the ship.[2]

[2. Cited in Fuller v. Colby, Case No. 5,149, to the point that a master may punish for disrespect, disobedience, or disorder on board, as far as a parent may a child.]

[3. A ship's master has no authority to inflict corporal punishment upon a seaman for repeating to members of another ship's crew harsh words of their captain, accidentally overheard, nor for falsely and maliciously telling them that their captain used such words, although the action of the seaman tends to create discontent and ill feeling among said crew, against their captain.] [2]

In admiralty. This was a libel for a marine trespass [by Bangs against John L. Little. Decree for libellant.]

The libellant alleged that he shipped at Portland for a voyage in the brig Brutus, John L. Little, master, from this port to one or more ports in the island of Cuba; that he faithfully performed his duty on board said brig, and was obedient to all the lawful orders of the officers; and that while at Matanzas, on the 15th of February last, the said Little, without any just cause, ordered him to be tied up by the hands to the rigging of the vessel, when with a twisted thong, called a cowhide, he struck him a dozen blows on the back, from which he suffered great pain in his body, and great mortification and humiliation in his mind.

The respondent, in his answer, admits the shipping of the libellant as stated in the libel, but denies that he did his duty as a good and faithful seaman, and alleges that he was careless, negligent, and indifferent in the performance of his duty, and not a good seaman in any one particular; "that at Matanzas. in said island of Cuba, the said Bangs, regardless of his duty as a mariner and as a man, and with a view to do mischief and disaffect the crew of the brig Franklin, and to irritate them and induce them to neglect and refuse to perform their duty on board said brig, and to enrage them with the master, George Brazier, did in fact clandestinely, as he himself confessed, listen at the door of the cabin of the said brig Brutus, and pretend that he overheard a conversation between said Captain Brazier and this respondent, in which he said Captain Brazier declared he would flog his whole crew;" the answer then proceeds to allege that this was untrue, and that no such conversation took place, but that the libellant told this story to the crew of the Franklin, by which they were made uneasy and dissatisfied with their captain, and that Capt. Brazier complained to him of this conduct of the libellant. It is further alleged that Bangs, upon being charged with the fact, denied it, "whereupon this respondent having proved the fact, that he had been thus clandestinely listening at the cabin door, and had thus basely lied, this

[1] [Reported by Hon. Ashur Ware, District Judge.]

[2] [Flogging in the navy and merchant service of the United States was abolished by a rider to a naval appropriation bill. Act Sept. 28, 1850; 9 Stat. 515; Rev. St. §§ 1624, 4611.]

respondent without anger, and to prevent such practices in future, did tie up said Bangs as he has stated, and did moderately chastise him by giving him one dozen blows with a small cowhide whip, without doing him any material injury." A number of witnesses were examined on both sides, and the material part of the evidence is stated in the opinion of the court.

Mr. Haines, for libellant.

Fessenden & Deblois, for respondent.

WARE, District Judge. The pleadings and the evidence in this case present a question of considerable delicacy and importance, as it affects the general police of our commercial marine. The libel is for an assault and battery by the master. The master in his answer admits the battery, as charged in the libel, and pleads a special justification. That the master has a general authority to inflict corporal punishment on one of his crew, in a reasonable and moderate manner, for any act of wantonness or carelessness by which the property intrusted to his care is injured or put in jeopardy, or for disobedience, or for riotous, disorderly, or insolent conduct, when it is necessary to maintain the discipline and subordination of the crew, is not denied. If that were the only point involved in the case, the inquiry would simply be whether any such offence has been committed, which the safety of the ship or the maintenance of good order and discipline required to be punished; and if there had been, whether the punishment were greater than the occasion required. That, however, is not the precise question which is presented in this case. It is, whether the master is authorized by the marine law to punish a seaman for any moral delinquency, which does not endanger the ship or cargo, and does not tend directly to the subversion of the discipline or good order of his own crew. For this is the ground on which the master puts his justification. It is, that the libellant "regardless of his duty as a mariner and a man," for the purpose of creating disaffection in the crew of another vessel towards the master, fabricated and told the crew of that vessel the false stories stated in the answer.

It is true that the master in his answer charges the libellant with listening at the cabin door to overhear his private conversation with the captain of the Franklin, who was then in his cabin; and if this fact were satisfactorily proved, it might undoubtedly be relied upon as an offence against the police and good discipline of the ship's crew. For the seamen are not only required to obey the orders of the master in all that relates to the navigation of the vessel and to the services for which they are engaged, but they are bound to observe towards him a decorous and respectful demeanor. Listening at doors and windows, for the purpose of overhearing and prying into the private affairs of another, is in any case a gross impertinence; it is

particularly so when practised by a seaman towards the master of a vessel. But if the master relies on this charge of eavesdropping as a justification of the punishment, he must produce satisfactory evidence of the fact. Crimes and faults are never presumed without proof. The evidence in this case is, that the libellant was sent by the second mate to the round-house to get some spun-yarn, and in going for it he passed by the cabin door, so near that he might hear any thing which was spoken in the cabin in the ordinary tone of conversation. On his return he stated to one of the crew that as he was passing the cabin door, he heard Captain Brazier repeat the words alleged in the master's answer. No blame can be attached to him for hearing, while he was in the performance of his duty, what he could not avoid hearing, and there is no direct proof that he stopped to listen at the door. Neither the officer who sent him, nor any of the rest of the crew, saw any thing of the kind; and the manner in which he mentioned the conversation when he returned, rather implies that he had not come to any stop; for he said that he heard it as he was passing the door. The only part of the evidence, from which it is inferred that he stopped to listen, is that of Van Buskirk, one of the crew of the Franklin, to whom he mentioned the conversation. According to his testimony, he said that he listened and heard the conversation. So far as an inference can be drawn against the libellant from this mode of expression, it is met and neutralized, at least, by the form of the expression used when he stated it to one of the crew of the Brutus, immediately after it was heard.

Assuming, then, the allegation of the master in his answer to be true, that the story told to the crew of the Franklin had no foundation in fact, but was fabricated and told for the purpose of producing discord and trouble in that vessel between the master and the men, the whole justification turns upon this point, whether the master is authorized by the maritime law to inflict corporal punishment on one of his crew for general immorality. The counsel of the master have placed his defence on this broad ground. It is contended that his authority to correct and chastise their moral delinquencies is co-extensive with that of a parent over his children, and with that of a schoolmaster over his scholars. It is true that the text writers on maritime law, in treating of the authority of the master over his crew, compare it to that of a parent, and of a schoolmaster. But it does not follow, because the authority is similar, that it is identical. The objects and purposes, for which the law allows to one man an authority of control and discipline, over another, must determine the limitation and extent of that authority. The parental power has its foundation in natural relations, and its objects are the protection, the discipline, and instruction of the

child during the period of infantile imbecility and youthful thoughtlessness and improvidence; and it is indispensable to the well-being of the child, through that period in which he is progressively acquiring the bodily strength and moral experience which are necessary for his support and for the government of his own conduct in life. It is a duty imposed by nature on the parent, who is under a natural and moral obligation to train up his child in such habits and in such modes of thinking and acting, as will make him a useful member of the community, and at the same time be a guaranty of his happiness in after-life. The understanding and the will of the parent are substituted for those of the child, until the intellect of the child is sufficiently matured and enlightened by experience to be safely relied upon as his own guide. A preceptor of youth is placed for many purposes in loco parentis, and the authority which he exercises over his pupils is a delegation of the paternal power. But the authority of the master of a vessel over his ship's crew, though it bears a certain analogy to that of a parent and schoolmaster, stands upon very different reasons, and is allowed for different purposes. The service in which he is employed is one of uncommon peril, not only requiring great skill, but often demanding great promptitude of decision and action, and admitting no time of delay for deliberation, reasoning, or expostulation. Upon him the obligation is imposed to meet and provide for these emergencies, and if there is not an instantaneous obedience to his orders, it may involve the loss of the ship and all who are in it. The law invests him, therefore, with the absolute power of command, and clothes him with all the authority which is necessary to enforce the most prompt obedience to his orders. The office of master is also one of great personal responsibility. He is answerable to those who have intrusted their property to his care, for losses and damage, which may happen not only from his own personal faults or neglect, but for such as arise from the negligence or unfaithfulness of the men, whom he employs. The law having rendered him responsible for the negligence and misconduct of his men, has given him a large discretionary authority to correct such misconduct in a summary manner; and as the general security of the vessel and cargo depends upon the general fidelity of the crew and the promptness of their obedience, it authorizes the master to enforce that fidelity and punctuality by the ministration of corporal punishments, when it becomes necessary for the maintenance of good discipline.

If then we measure the authority of the master by the reasons and purposes for which it is granted, we shall find that it is by no means coextensive with the paternal power; and when it is likened to the power of a parent, it is rather with reference to the nature and kind of punishments that may be inflict-

ed, than to the extent of the authority. It extends to the correction of all acts of negligence or misconduct in seamen that are incompatible with the duties of their employment, with a proper care and attention to the safety of the ship and cargo, and with the good order and general discipline of the ship. All this the master has a right to require of them, and for all this they have contracted, but he has a right to require nothing more. The law does not invest him with the authority over his crew of a general praefectus morum, to correct and chastise them for general immoralities, that are not incompatible with a faithful performance of the service for which they engage. For such delinquencies, like all other men, they are responsible only to the law. Such we find to be the limitation of the master's authority, whether we look for the rule in the ancient sea ordinances or in the most approved modern writers on maritime law. In examining the old ordinances we find, in fact, that the authority of the master to inflict corporal punishment on his men, in any case, is rather an inference from the general provisions of those codes, than a right standing on any express text. But there is nothing in any of them that will by the most remote inference justify the master in the exercise of such authority, except in cases of misconduct that relate directly to their duties, or to the general police and good order of the ship. The Ordinance of the Marine of Louis XIV. liv. 2, tit. 1, art. 21, does in its terms authorize the master, with the advice of the mate and pilot, to punish mutinous, drunken, and disobedient seamen, and those who ill-treat their shipmates and commit similar offences. "It is of the last importance," says Valin, "that good order and subordination be preserved on board vessels. It is for this reason that obedience to the master has been perpetually recommended to the crew, with a power in him to inflict certain punishments on the mutinous, the drunken, the quarrelsome, and those who maltreat their companions; in one word, on all those who disturb the order and service, or who commit faults for which they may be expelled from the ship, and discharged without wages." 1 Valin, Comm. 447; Abbott, in his treatise on Shipping, (part 2, c. 3, § 4,) and Chancellor Kent, in his Commentaries, describe the authority of the master in similar terms. "Being responsible over to others," says Kent, "for his conduct as master, the law, as well on that account as from the necessity of the case, has intrusted him with great authority over the mariners on board. Such authority is requisite for the safe navigation of the ship, and the preservation of good order and discipline He may imprison, and also inflict reasonable corporal punishment upon a seaman, for disobedience to his reasonable commands, or for disorderly, riotous, or insolent conduct; his authority in that respect is analogous to that of a master on land over his apprentice

or scholar. The books unite in the lawfulness and necessity of the power. Without it, authority could not be maintained, nor navigation made safe." 3 Kent, Comm. (3d Ed.) 181. The master of a vessel, says Casaregis, has no large jurisdiction in his ship, but only a kind of economical authority and power of discipline, extending to a slight chastisement, pro corrigenda insolentia et male morata vita, seu licentia nautarum et vectorum, such as a father has over his children, a schoolmaster over his scholars, or a master over his servants and domestics. Quoted by Valin, (volume 1, p. 449.)

These authorities are undoubtedly sufficient to justify the master in correcting by reasonable chastisement, administered on the spot, the misconduct of any seaman, which endangers the safety of the ship or cargo, or which tends to the subversion of the good order and discipline of the ship's crew, but they furnish no warrant for his assuming judicial authority, and in the quality of a domestic judge animadverting on the general moral misdemeanors of his men, which are not incompatible with the faithful performance of all those duties for which they engage by their contract. Such an authority is not necessary to the master for the safety of navigation and maritime commerce, and the law, in conferring this extraordinary power upon him, has justly limited the exercise of it to those cases which the exigencies of the service imperiously require. If, then, all the facts are conceded as stated in the master's answer, with the exception of listening at the cabin door, and this is not proved, they will not constitute a justification. Admitting the story told of Capt. Brazier to have been fabricated, though it ought to be observed that this from the evidence is far from being certain, whatever animadversion it may deserve as a breach of moral duty, it was no offence against Captain Little. It neither put in jeopardy property of which he had the care, nor had it any direct tendency to weaken his own authority, or subvert the discipline of his own crew, and therefore it was not within his authority to assume jurisdiction over the offence, whatever it might be. Decree thirty dollars damages and costs.